Good morning, Your Honors. May it please the Court. I'm Robert Jobe and I'm appearing today on behalf of the petitioner, Edwin Aki. The last time this case was in the Ninth Circuit, the Court dismissed, for lack of jurisdiction, Mr. Aki's claim that the immigration judge had erred in concluding that he had failed to file his application within a year of his last entry and that he had failed to demonstrate that he qualifies for any of the exceptions set forth therein. The case is back again, and obviously we're raising that same issue, and the government contends that this Court lacks any jurisdiction to entertain it during the second trip to the Ninth Circuit. None of the authorities cited by the government, however, actually support its position. 242D of the Immigration Act precludes the Court from reviewing an issue only that has been where the Court has decided the validity of the order. Well, here, obviously, the Court dismissed that portion of the earlier petition for review for lack of jurisdiction, so it never considered the validity or the appropriateness of the immigration judge's ruling with respect to the one year. The doctrine of res judicata doesn't apply here because, obviously, since the issue was dismissed, the Court refused to hear the issue for lack of jurisdiction. There's never been a final judgment on the merits. And similarly, the law of the case shouldn't apply here because, obviously, at the time that the Court dismissed that portion of the original petition, Ramadan 1, the original panel decision in Ramadan, was a controlling law, and that decision was subsequently withdrawn by the panel itself. And the panel issued a new decision that resulted in a 180-degree turn in the law that made clear that, in fact, this Court does have jurisdiction with respect to issues relating to the one-year rule insofar as it involves application of law to undisputed facts. And how come this does? Well, it's our view, Your Honor, and I agree, I think really that's the question. It's our view that here the immigration judge really just failed to apply the regulatory test in any fashion to the facts of this case. The regulatory test requires there be an extraordinary circumstance that's directly related to the failure to file and that you make it showing that the applicant filed within a reasonable period of that extraordinary circumstance. Now, here, the immigration judge doesn't go through any of that test. She says here, on page 83 of the record, she asserts her conclusion that the Court concludes that the Respondent has not met his burden of establishing any extraordinary circumstance for failing to file. But we know that PTSD can be an extraordinary circumstance. Well, but there were different explanations. Well, his expert said, well, it's because of traumatic events. Well, he said, well, it's because I didn't know what to do. And I even consulted a few lawyers. I mean, so why couldn't why is the IJ compelled to find that one version of what happened as contrasted with the other? Well, the immigration judge has an obligation to assess whether the reason that he's offering was directly related. She never did that. The two lines of argument that were offered here by the immigration judge, they're not incompatible, obviously. And what the immigration judge did, her error was to suggest that he had to show that either one or the other was the cause, the one and only cause. And that's not the case. All he has to do is show, A, there's an exceptional circumstance. It's undisputed he's got the PTSD. No one disputes that. We had two experts, one that offered written testimony and the other one that was offered live testimony. It does mean that there's nothing for us to review. Pardon me? It does mean that there is nothing for us to review, doesn't it? I mean, we can review when there are the facts are undisputed. No. And they're not. The fact of whether he has PTSD, that is undisputed. Well, the fact that he said that he the reason he didn't apply was because he didn't know how to and he consulted some lawyers and still couldn't figure out how to is also undisputed, I guess, if you want to look at it that way. But they collide. It's two different explanations. But my view is that they don't collide. And the reason for that is that even if he consulted lawyers, the question is, why was he so easily deterred from going forward? And his PTSD may well have contributed to that. The problem here is that the immigration judge never grappled with that question. The regulations require, once he said, I've got PTSD, and PTSD can be an extraordinary circumstance, her obligation under the regulations was to make an assessment, was that, was his PTSD directly related to his failure to file within a reasonable period of time? She never actually addressed that question. She addressed a different question. In her decision, she asked the question, did the PTSD cause him to fail to file in a reasonable period on time? Did it prevent him from failing? That's not the test. The regulations require simply not that it be the sole cause, but that it might be a contributing factor. And they want the immigration judge to consider, was the PTSD directly related? She never considered that question. And it's that failure to consider that question that's the legal error here. She never also considered the question about assuming that there is an extraordinary circumstance, the PTSD, and assuming that it's directly related. Then she would have had to reach the third question about whether he applied within a reasonable period of time. It's a three-part test. She actually didn't apply any of the three parts of the test. She said, well, there's this other thing that could explain it. Well, that's true. It could explain it. But the two things might also be working in tandem. And the mere fact that there's some other causation here doesn't mean that his PTSD wasn't also directly related to his failure to file. Her failure to apply that test is an error of law. This Court has jurisdiction to consider it. And on that point, it should vacate and remand so the judge can apply the proper test. Now, on the CAC claim, the CAC came and said this. So you are asking for a remand on Zerzillan for application of Rambodan II? Yeah. Application of the proper legal standard to the facts of this case. Because she actually never did that. She never applied the regulatory standard, the three-part test, to the facts of this case. Yes. I don't think that it would be appropriate for the Court to reverse and apply that standard in the first instance. The problem is the judge never really applied it in full. And so it has to go back for the judge to do that in the first instance. Yes, under Ventura. Okay. Now, the only other issue presented here, it seems to me, is the CAC claim. And the CAC claim rests, the Board's denial of the CAC claim, it seems, hinges on the issue of Mr. Akee's credibility with respect to whether or not his brother recently ran into some problems. The IJ and the Board both were troubled by the fact that this wasn't raised on direct, it was only raised on cross-examination. But if you look at the record, that clearly is explained by the questions that were asked. On pages 149 and 150, this is where this comes up in direct. And he was asked, when was the last time you talked to your family? About a week ago. He says, did you have any conversation regarding conditions in Guatemala? He says, they always tell me. Well, what did they say? I tell them I miss them, I'd like to be with them down there, and they tell me I'm best staying here if I can. Why are you best staying off here? Because of the danger, because of the same thing that happened to me before. But on cross, he was asked a slightly different question by the government lawyer, who was actually going out of his way to develop the record, and that's much appreciated. This is on pages 157 and 158. He says, now, since you left Guatemala, have any of your brothers and sisters ever been arrested? Very more direct question, very different question. I don't know if arrested, do you mean by being in jail? Yes. Then he says no. But then he goes on to say, have any of your brothers and sisters ever been harmed in any way by the Guatemalan military since you left the country? And he answers that more direct question, yes, they have. What's the worst thing that's ever happened? And then he recounts what's happened to his brother. I mean, there's no inconsistency here at all. It's just that on direct, he was asked some vague questions about what his family's been telling him. He answered by saying, they're urging me to stay here in the United States. And on cross, when the government was trying to develop more fully the record, he was asked this. I just don't understand what I.J. was saying is when explaining as to why he would be better off staying here, that giving the incident with the brother would be a fuller answer to that question. And it's strange that he doesn't raise it. There's some inconsistency as to the reason why the brother was. Was it because he looked like him or some other reason? On that point, Your Honor, I don't think there's any inconsistency about whether he was arrested because he looked like him. He made clear that he was not arrested because he looked like him, but they did say that you look like your brother as they beat him. But your earlier point with respect to whether there was any inconsistency here about whether he should have raised this earlier on direct, the answer is no, because he already had testified that his family had a long history. They've always been persecuted by the military. He made that clear early on in his testimony. So he had no reason to repeat that when he was asked again about what communications he's had with his family in Guatemala. It wasn't until he was asked the more specific question during cross-examination that he had any reason to. When did the incident with the brother happen? I think he said about a month before the hearing. He said he spoke with his family about a week before the hearing, and the incident was about a month before. So that's why we've got it on you. So he's talking about the conversation he has with the family. And he doesn't sort of mention this as a factor when he answers about how, oh, you know, you're better off staying there. So the I.J. says, well, we think, you know, I think you're sort of making it up as you go along. It's basically what the I.J. Yeah, that's what the I.J. suggested. But, you know, I would urge the Court to look very closely at the questions that were asked, because this is a guy with a seventh-grade education, and he answered directly the questions that were asked. The question that was asked on direct was very vague. The question that was asked on cross was very specific, and he answered that question very specifically. Okay. We'll hear from the government. May it please the Court. My name is James Hurley, and I represent the Attorney General. This petition for review should be dismissed in part and denied in part. This petition should be dismissed because the Court lacks jurisdiction to review the agency's determination that the one-year bar to the asylum application applies in this case. This petition should be denied because the agency's determination that Mr. Aschke did not deserve cat relief is supported by substantial evidence. As to the first point, I would like to point out that since this case has been in removal proceedings and before this Court, the landscape has changed about whether this Court can look at certain questions. And there's no doubt that this Court has jurisdiction to determine its jurisdiction, so it can look at that question. But I would like to point to the fact that or the point that Judge Reimer made that the facts are in dispute in this case in regard to the one-year bar issue. Originally, when this case came up, he was arrested in San Rafael, placed in removal proceedings, and they had initial proceedings before the IJ. And the question of whether or not he could apply for asylum came up, and he actually filed a brief in support of his decision that he could. And the IJ allowed him to apply for asylum, citing the PST or post-traumatic stress disorder. And that decision came down in 2000. Once we got to the merits hearing, or actually before that, when the licensed therapist testified, he testified that he had post-traumatic stress disorder, that he was afraid of authority figures, and that's the reason why he didn't apply for asylum. However, when we get to the merits hearing, they asked Mr. Aschke why he didn't apply for asylum. He said, I didn't know how. I was waiting for, you know, my status to get fixed. So the immigration judge, on page 82 of her decision, says that there's a discrepancy there between what the licensed therapist said, Mr. Krafick or Krafnick, and what the Mr. Aschke said. And because that's a factual discrepancy, this case does not present a mixed question of law and fact. This is – there is a disputed fact question there. What your opponents seem to be saying is it was two things about that. Number one, that the IJ didn't, I think either way you put it, didn't grapple with the inconsistency you just kind of pointed out. And number two, applied the wrong legal standard. What about those two things? I would disagree with both counts of that. The immigration judge was presented with the facts in both Mr. Krafnick's testimony and then in the respondent's testimony, and they didn't mesh. I mean, before he had – he filed that brief and he submitted two letters from, I guess, a therapist, too, that said that he had post-traumatic stress disorder. So the IJ was grappling with those two factual points that didn't mesh. And she said, you haven't proven that you have extraordinary circumstances. So according to INA 208a3, this Court doesn't have jurisdiction to review that factual determination. But you think she grappled with them enough, in other words. She did. And she said specifically in her decision that on page 82 of the record, it said, Respondent's testimony is not consistent with that of Krafnick, who claims that the Respondent was unable to seek assistance because of his alleged trauma and fear of authority figures. And even if you look at Dr. Krafnick's testimony, on cross-examination, the immigration or the DHS attorney said, well, you know, you say that he's afraid of authority figures and he fears the Guatemalan government, but do you know that he went to the Guatemalan consulate in San Francisco and got a Guatemalan identity card? And Mr. Krafnick was kind of taken aback and said, oh, I'd be interested to know why he did that, because that goes against completely what the PSTD, post-traumatic stress disorder argument that they had. So this is purely a factual question that the immigration judge determined, and this Court doesn't have jurisdiction to review that. And then with regard to the CAT claim, Mr. Asprey hasn't been ---- I'm sorry. Before we get to the CAT claim, I'm still trying to understand the implications of Ramadan. Your opposing counsel, Tim, believes we, if I understand correctly, that we can review whether or not the IJ applied Ramadan properly. Now, that's ---- there may be a disputed issue of fact, but if the IJ didn't apply Ramadan to properly, we can remand for what he argues is a prop application. And I was listening for an answer to that argument when he was speaking, and I didn't catch it. So can you just address that? Well, you have to look at the timeline of this case. The IJ's original decision, the only IJ decision in this case, is from March 11, 2003. That's in 2003, and then the Real ID Act came down in 2005. And when it came up before the court here, they made the decision in December of 2005 applying Ramadan 1, which was a 2005 decision, I believe. And that said that, blanket, there's no jurisdiction to review this timeliness issue of extraordinary circumstances. So that was in 2005. It goes back before the board, and the board issues a second decision in July of 2006, and then Ramadan 2 comes down in February of 2007. So all of the implications of Ramadan came down since this case has been decided by the board. So to answer your question... So no blame attaches to the BIA or the IJ for failing to properly apply Ramadan 2. There's no moral failing there. That's correct. But nevertheless, counsel is saying, now we have Ramadan 2 as the law of the circuit. And it is the law of the... We don't all agree that it was a good decision, but it is the law of the circuit. And he is saying we can review whether what the administrative agency did complies with what is now the law of the circuit. And he argues they didn't, probably because it wasn't the law of the circuit at the time. And that's my point exactly, that the Ramadan decision, the Houssieff decision, the Lynn decision that came down this year, that applies to the next question of law and fact. But in this case, the facts are in dispute. Judge Reimer's point where there's a discrepancy there between what Mr. Kraftnick said about the PSTD and then what Mr. Ashcroft said as far as his explanation for not filing within one year, there's a factual dispute there. And INA 208a3 says that this Court doesn't have review to or doesn't have jurisdiction to review the agency's factual or the agency's definition. Right. Ramadan 2 doesn't have anything to do with what the agency does, does it? I mean, it has to do with what we can review. Yes. If I understand it correctly, Mr. Jobe's argument is that under Ramadan 2, we can now review what we couldn't review on the first trip to this Court. And if we took a look at it, then we would see that the I.J. did not properly apply the regulations. Have I got that right? Mr. Jobe is nodding affirmatively. I just want to be sure I understand his argument. Okay. My understanding of the nuances of the mixed question of law in fact is that the facts have to be not in dispute. In this case, the Petitioner was found not credible. So that means that everything he said, they're mere assertions. I don't think that's quite right. I think what it means is if there's a factual dispute, we can't resolve it. We can't second-guess the way the I.J. or the Board resolve the factual disputes. But if there is an underlying legal issue that infects or arguably infects the fact-finding process, in this case it would be the failure to apply the PTSD regulation, then the we'd say, well, you know, since there are disputed facts, the failure to apply the law properly could well have affected the fact-finding process. And therefore, we ought to send it back in the Ramadan, too, for the I.J. to make the findings anew, applying the PTSD regulation. Is that the argument? I think that's the argument. But if you send it back, though. It's pretty plausible. If you send it back, that's the I.J. would do the same thing. You're asking the I.J. to make the same factual determination? We don't know. We don't know. Because the I.J. might take a hint that we said, you know, look at this regulation, and the I.J. may look at the PTSD regulation, and that might affect the decision-making process, no? Well, the I.J. was aware of the PTSD argument. In 2000, the ASCII filed a brief saying that you should consider asylum because I had PTSD. And the I.J. in the I.J.'s decision, the June 16th order, page 422 of the record, she said, okay, I'm acknowledging that your excuse is that you had PTSD, so we'll consider it. We get to the merits hearing, or actually there were two hearings here. We get to Mr. Kraftnick's testimony. He says PTSD, that's what he had. When we get to the merits hearing, Ashke doesn't talk about PTSD at all. He was given the opportunity to explain why or they asked him why he didn't file asylum. He said, I didn't know how. I wanted to wait until my status was fixed. You know, I asked around. I asked a few lawyers. You know, they couldn't help me. So he didn't apply for asylum until it was five years after he got here. And his explanation was, I didn't know how. And that's a, that is not the same thing as I had PSTD and I couldn't, I was, you know, I wasn't able to do it because I was scared of either the U.S. government or Guatemalan government. So that's, if this court were sent to send it back down, it would be reviewing the factual determination made by the immigration judge and affirmed by the board in this case. I think we're in a sound position. And quickly before I go, as far as the cat claim goes, Mr. Ashke wasn't tortured in the past and he hasn't shown that it was more, it would be more likely than not that he would be tortured upon his return to Guatemala based on. But if you take the, if you consider the brother incident, then the, if you consider the timing becomes quite different, right? It's one thing to say a petition was harmed during the revolution, the revolution is now long past, the conditions have changed. But again, that goes to the credibility issue because as you were discussing before, at first he said, I just talked to my family last week, you know, they said they missed me, but I should stay here. And then on cross-examination, the story changes. And he says, oh, the authorities apprehended my brother and they held a gun to his head and they said, you look like me and that's why we're doing this to you. So that indicates that he was kind of making his story up as he was going along. I mean, he could say that he had a limited education, but that's just one possible explanation. The other explanation is that he was making it up as he was going along. And further, he also said that his... But you agree that if we don't buy that explanation, the IJ's treatment of the brother testimony, which is debatable, but let's say we don't buy it, then that is another instance of torture that's much more recent and that would figure in the CAC analysis. Again, but there's an adverse credibility decision here that we, this Court reviews for substantial evidence and there's nothing in the record that compels it. I understand, but you're fighting the question. Assuming we disagree with you on that, let's say we think that the IJ's credible determination is not supported by the record, then the brother incident comes in and it is recent enough that it would be taken into account in the CAC analysis, right? Well, again, that goes to the different context in which he explained that scenario. He said at first they thought he was him, so they held a gun to his head. And if that was taken as true, then you could consider that. But then he also said, later on he said, they targeted him because he was an indigenous Indian in Guatemala and that would go to his, that wouldn't relate to him at all, even though he is indigenous. That was something directed towards his brother. Well, but if he got tortured or beaten because he was an Indian and then his brother gets beaten either because it's him or because he's an Indian, then that brings it all forward, doesn't it? It counts either way. Well, if you're taking his testimony as true and reversing the adverse credibility determination by the agency, then you would have to consider that. But you have to look at the record as a whole and you have to look at the fact that Guatemala population is indigenous. They had the peace accords in 1996. So that factors into whether or not this Court sustains the adverse credibility determination. Any other questions? Thank you. For the foregoing reasons, we ask the Court to dismiss in part and deny in part. Thank you. I think you are out of time. Would you like a minute or both? On the CAC claim, it seems to me if the Court rejects the adverse credibility finding on that one point with respect to the brother, the appropriate thing then to do would be to remand the case to the Board so that it could reassess the CAC claim in view of that ruling. The thing that bothers me most about this case, though, is the idea that Mr. Aki's failure to file either has to be because of one reason or the other. And people normally, when they act, they normally act for a multitude of reasons. And here he testified when asked on page 172, how did you feel about the possibility of going and applying for asylum? He said, I thought it was going to be the same thing, but I always had that fear I was going to be deported. This ties into the psychological examination. My point is simply that he offered proof that his failure to file was related to his post-traumatic stress. The judge never considered the question, the legal question about whether the PTSD was directly related to his failure to file. In failing to do so, she didn't comply with the regs. She didn't apply the proper test. And just on those grounds alone, it's got to go back. Thank you. The case is signed. We'll stand some minutes.
judges: Kennelly, Kozinski, Rymer